UNITED DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

RYAN O. JORDAN,                        )
                                       )
                Plaintiff,             )
                                       )
vs.                                    )        Case No. 2:06CV00046 ERW (AGF)
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
                Defendant.             )


## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security denying Plaintiff Ryan O. Jordan's application for

disability insurance benefits and supplemental security income under Title II of the Social

Security Act, 42 U.S.C. §§ 401-434, and Supplemental Security Income under Title XVI

of the Act, 42 U.S.C. §§ 1381-1384f.  The action was referred to the undersigned United

States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition.  For the

reasons set forth below, the Court recommends that the decision of the Commissioner be

affirmed.

Plaintiff, who was born on February 24, 1980, applied for benefits on November

20, 2004, due to nerve damage to fingers, a shoulder injury, depression, and

schizophrenia.  Tr. at 186.  Plaintiff claimed a disability onset date of August 31, 2000,

which was later amended to April 19, 2004.  After his application was denied at the initial

administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on December 6, 2005, at which Plaintiff and a Vocational Expert ("VE") testified. On January 26, 2006, the ALJ issued a decision that Plaintiff was not disabled as defined by the Social Security Act. The Appeals Council of the Social Security Administration denied Plaintiff's request for review on June 19, 2006. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action.

Plaintiff argues that the ALJ's assessment of Plaintiff's Residual Functional Capacity ("RFC") did not adequately take into account Plaintiff's mental limitations, and that as a result, the VE's testimony, based upon that RFC, did not constitute substantial evidence in support of the decision that Plaintiff was not disabled. Plaintiff asks that the case be remanded for the award of benefits, or alternatively, for reconsideration.

**<u>Medical Record</u>**

As Plaintiff's only argument before this Court involves his mental impairments, the Court will focus its review on the medical record related to this issue. With regard to Plaintiff's physical impairments, the Court notes briefly that as a result of ulnar nerve surgery on his right arm in 1992, Plaintiff had right ulnar neuropathy, with persistent flexion contracture of his right pinky, ring finger, and part of the middle finger. Plaintiff also had a history of left shoulder bursitis/tendinitis, beginning in January 2003. On December 13, 2004, Gregory K. Ivins, M.D., examined Plaintiff, and advised him to avoid work that required repeated use of his arms overhead. He opined that Plaintiff

could perform a medium level of exertion, but should avoid repeated overhead reaching, and that Plaintiff had limited right extremity fingering and feeling.  Dr. Ivins believed that Plaintiff could sustain a 40-hour workweek on a continuous basis, and could occasionally lift 50 pounds and frequently lift 25 pounds.  Tr. at 334-39.

The first medical evidence involving Plaintiff's mental problems is an intake form dated April 19, 2004, from a mental health center where Plaintiff was seen on a crisis basis.  Plaintiff complained of nervousness around a lot of people, increased anger, a racing heart, "hot, sweaty, feelings that something bad would happen," inability to hold a job, crying spells, depression, panic attacks, and social anxiety.  Plaintiff reported that he had been in inpatient care for two or three months at age 14 for depression, and that he was seen at age 18 for counseling.  Plaintiff also reported that both of his parents had substance abuse problems, and that his mother had a history of depression.  The attending therapist noted that Plaintiff had the following symptoms/behaviors: suicidal thoughts, depressed mood, cognitive impairment, flight of ideas, change in appetite, change in weight, sleep disturbance, non-attentive to personal hygiene, anxiety or panic attacks, recent loss of family members, hallucinations, paranoia, isolation, legal problems, and deterioration of work performance.  The therapist indicated that Plaintiff should have intensive outpatient service, due to his "depressed mood not related to a chronic condition."  The therapist, as well as psychiatrist John R. Hall, M.D., diagnosed depressive disorder, recurrent moderate; panic disorder with agoraphobia; and a Global

Assessment of Functioning ("GAF") of 50.[1]  Plaintiff was prescribed Remeron (an anti-depressant).  Tr. at 367-75.

The record includes treatment/progress notes from the mental health center dated June 23, 2004, through April 11, 2005, prepared by Dr. Hall's nurse practitioner, Sandy Nolan, and co-signed by Dr. Hall.  Where Dr. Hall signed the notes, the Court will refer only to him, as the treating physician.  On June 23, 2004, Plaintiff reported becoming more depressed about two years prior when his mother had a heart attack.  He complained of crying spells once a week, not being able to "take" being around people, feelings of helplessness and worthlessness, depression, panic attacks, social anxiety, trouble in his relationship with his girlfriend, severe financial stressors, and inability to keep a job because of his inability "to sustain calmness around others."  On examination, Dr. Hall noted that Plaintiff was alert and had good hygiene, and that he had appropriate eye contact and motor activity.  He had suicidal ideation with no intent.  Plaintiff complained of a depressed mood, problems with memory and concentration, periods of unusual energy, recent weight loss, problems sleeping, and restlessness.  Plaintiff denied delusions, but did complain of hallucinations and paranoia.  Dr. Hall further noted that Plaintiff reported that he had an impaired relationship with his girlfriend because of his

---

[1]    A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 41 to 50 reflect "serious" difficulties in social, occupational, or school functioning; scores of 51-60 indicate "moderate" difficulties in these areas; scores of 61-70 indicate "mild" difficulties.

4

anxiety and panic attacks, had difficulty with responsibilities around the house because of his isolation, and had difficulty with contact with people. Plaintiff further reported that he had been molested in the past by an uncle. Dr. Hall assessed Plaintiff with major depressive disorder, recurrent, moderate; panic disorder with agoraphobia; and a current GAF of 50. Plaintiff was prescribed Remeron. Tr. at 364-65.

Plaintiff was seen for psychotropic medication management on July 14, 2004. Plaintiff reported that he could not tolerate Remeron. He further reported that he was involved with a job placement program and had been on a job tryout. The progress notes state, "This was an uplifting experience for him. He has been able to see that he is capable of working in a small environment with few people." Plaintiff reported that he did well on the job assessment and hoped that he could be hired. The progress notes state, "This is a possibility." Plaintiff also had another job tryout in the following week. He also reported that he continued to have symptoms of depression and problems with sleeping, lying in bed "worrying all night long." He had ongoing stressors due to owing past child support. It was noted that Plaintiff was able to ventilate his thoughts appropriately, and had appropriate coping mechanisms. Plaintiff was assessed with major depression, recurrent. Remeron was discontinued and Lexapro was prescribed. Tr. at 363.

On July 28, 2004, Plaintiff was seen at the emergency room with complaints of left shoulder pain. Treatment report notes that Plaintiff was on Lexapro, but that he was not taking it. Tr. at 252-66.

Dr. Hall's progress notes dated September 1, 2004, state that Plaintiff reported that he was "really stressed," was experiencing mood swings, had a new baby, and was still involved with the job placement program. Plaintiff was "on no meds." He stated that his mind "won't shut down," and that Lexapro made him tired all day. He also complained about having no energy, losing his train of thought, depression, inability to stay focused, memory deficits, being irritable and agitated, and losing his temper easily. Plaintiff stated that nothing made him happy. Dr. Hall noted that Plaintiff was alert, oriented, cooperative, and had no psychotic symptoms, but was reportedly always sad. Dr. Hall assessed Plaintiff with major depression, recurrent, moderate. Lexapro was discontinued as it made Plaintiff tired all day, and he was started on Geodon (used for the treatment of schizophrenia and acute mania). Tr. at 362.

On September 16, 2004, Plaintiff complained to Dr. Hall that he was up every two hours to feed the baby. He was still involved with the job placement program, but got disappointed when he was turned down for jobs. Plaintiff reported that his medications "mellowed him out," that he was sad all day, wanted to scream and cry, had poor energy, and was still depressed with little motivation. Plaintiff also complained that his financial troubles were overwhelming. Dr. Hall noted that Plaintiff was alert, oriented, and calm, with no psychosis or suicidal or homicidal ideation. Plaintiff's mood was sad, and his affect blunt. Dr. Hall's diagnosis remained unchanged, and he continued Geodon with an additional prescription of Paxil. Plaintiff was to return for follow-up in three weeks. Tr. at 361.

A report-of-contact with the state disability determinations agency, dated December 20, 2004, explained that Plaintiff was contacted for an update of his mental status, as he had not been to the mental health center since September 16, 2004. Plaintiff stated that he had attempted to reschedule an appointment but was not given a new date or time or called back, and that he would re-contact the center for a new appointment. He stated that Paxil had been very helpful when he was hospitalized for depression in 1995 or 1996, and that since it was restarted in September 2004, it was controlling his symptoms, but that he ran out of it two to three weeks ago and was again starting to experience sleep loss and little appetite. Tr. at 170.

One day later, on December 21, 2004, non-examining consulting psychologist Paul Stuve, Ph.D., filled out a Psychiatric Review Technique form based upon his review of the medical evidence of record. Dr. Stuve indicated that Plaintiff had major depression, and panic disorder with agoraphobia. He indicated in check-box format that Plaintiff had mild difficulties with activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. Dr. Stuve wrote that Plaintiff's medications were being adjusted, that Plaintiff had not seen a psychiatrist since September of 2004, and that Plaintiff had reported the previous day that Paxil was helpful once he had restarted it and that his symptoms were once again controlled. According to Dr. Stuve, the evidence showed that when untreated, Plaintiff's mental impairment was severe and would preclude substantial gainful activity, but also showed "significant positive response to treatment." Dr. Stuve opined that with regular treatment compliance,

Plaintiff's mental impairment was projected to be non-severe within 12 months. Tr. at 342-54.

On January 17, 2005, Plaintiff saw Dr. Hall for the first time since September 2004, and reported increased levels of stress, and that he was off his medications. Plaintiff stated that he had had to leave town to find his 16 year old sister, whom he found in Chicago. Plaintiff reported that he had been with his girlfriend for six years and that the relationship was "rocky," that she had a job, and that he had been baby-sitting for the two children, the youngest of whom was four months old. Plaintiff further reported that he was "stressed out," but that Geodon helped with his sleep, and Paxil helped with his mood. Dr. Hall indicated that Plaintiff was alert and oriented, made limited eye contact, and had a euthymic[2] mood. His affect brightened upon approach, he exhibited no psychotic symptoms, and he was talkative. Dr. Hall's assessment was major depressive disorder, recurrent, moderate, and he continued Paxil and Geodon. Tr. at 360.

On April 11, 2005, Plaintiff saw Dr. Hall again, reporting that he was still on his medications, that his mood was stable with medication, and that he was sleeping well. Plaintiff reported that he was still not working, that he watched the children, the youngest of whom was eight month old, while his girlfriend worked, that his attitude was more positive, his energy was okay, and that there were no recent medication issues. Dr. Hall

_____

[2]    "Euthymic" is a medical term used to describe a psychological state that is statistically or otherwise normal, neither elated nor depressed.

noted that Plaintiff was alert and oriented, calm, had good eye contact, good hygiene, an euthymic mood, an appropriate affect, and goal-directed thoughts, with no suicidal or homicidal ideations and no psychosis. Dr. Hall assessed major depressive disorder, recurrent, moderate. Plaintiff was continued on Paxil and Geodon. Tr. at 381.

On May 10, 2005, Nurse Nolan prepared a Medical Assessment of Ability to do Work-Related Activities (Mental). The form, which indicates that it was accepted by Dr. Hall, defined a "fair" ability as, "[A]bility to function is seriously limited but not precluded." A "good" ability was defined as, "[A]bility to function . . . is limited, but satisfactory." In check format, the form indicated that Plaintiff had only a "fair" ability to deal with the public and with work stresses, function independently, maintain attention and concentration, understand, remember, and carry out complex job instructions, relate predictably in social situations, and demonstrate reliability. Plaintiff's had a "good" ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, understand, remember, and carry out simple job instructions, maintain personal appearance, and behave in an emotionally stable manner. It was noted that Plaintiff had difficulty with memory and concentration, and in expressing feelings and needs. Tr. at 358-59.

**Evidentiary Hearing of December 6, 2005**

Plaintiff and a VE testified at the evidentiary hearing. Plaintiff, who was represented by counsel, testified that he was 25 years old, had a 10th grade education, and received certification as a medical aide, which only required on-the-job training. Tr.

at 24-32. Plaintiff testified that ulnar nerve surgery resulted in the permanent curling of, and numbness in, his right ring and little fingers, and half of his middle finger, and that he experienced pain in his fingers if he had to grab or lift things. Plaintiff also testified that he injured his left shoulder at work, resulting in shooting pain when he attempted to lift things or perform repetitive work with that arm. Tr. at 32-36.

Plaintiff testified that he had worked as a fast food cook, but did not do well at those jobs because he could not handle the stress and anxiety of being around a lot of people. Plaintiff acknowledged that he held most of his jobs for only a month or two. He testified that he worked as a laundry aide at two different places, for about three months each. He left one of these jobs because he could not handle the stress, and he could not remember the reason he left the other job. Plaintiff worked as a night security guard for one month, working sixteen hours per week. He testified that he could not perform his job duties at this job because his psychiatric medications, Paxil and Geodon, did not allow him to stay awake at night. Plaintiff was a gas station attendant for one month in 2004, and also left this job due to stress and anxiety. Plaintiff testified that he worked at a McDonald's for about one month in 2001, and that he quit this job due to depression, stating that he could not handle the stress of being around a lot of people he did not know, and that he "got into it" with coworkers, and he "pretty much had to quit because . . . [he] couldn't take it." Plaintiff later testified that he was fired from the McDonald's job because he exploded verbally at his co-workers, due to stress. Tr. at 36-41.

Plaintiff described the problems which he had recorded on a Function Report on August 30, 2004. He had personal hygiene problems, such as failing to bathe, shave, or change clothes. He did not want to get out of bed and do anything, and would "pretty much mope around the house all day." Plaintiff stated that currently, with medication, this was "not so much of a problem as it was." He also described problems with shopping at the grocery store, due to the stress of being around a lot of people, with spending money wisely, spending his money in one place or on one thing, and with using a checkbook accurately. Tr. at 39-40.

Plaintiff reported that he went to a psychiatric health clinic in April 2004 because he was crying all day, did not want to leave the house, was constantly nervous, and was depressed. He received past inpatient psychiatric treatment from the clinic for two or three months when he was 14 for depression, and received about two weeks of follow-up treatment afterwards. Plaintiff testified that he was currently seeing his psychiatrist every three weeks, although he missed his last "couple of appointments" because of family problems, specifically, arranging to have his father moved to a nursing home. Plaintiff stated that the job placement program was trying to find a job that was suitable for him, and that he got the night security guard position noted earlier through the program. For the past seven years, Plaintiff had been living with his girlfriend in a mobile home, with two children, who at the time of the hearing were five-years old and 15-months old. Plaintiff also has a third child, with whom he did not live. Tr. at 39-45.

Plaintiff testified that he was currently on Paxil and Geodon.  He stated that he had contemplated suicide in the past, without indicating when this was, but that he had never taken any step toward doing so.  When asked if he currently hallucinated, Plaintiff responded in the affirmative, stating that he saw "shadows."  He also testified that he heard mumbling voices.  Plaintiff testified that his crying spells occurred approximately once a month for one or two days at a time with medication, as opposed to once a week before he was put on medication in April 2004.  These crying spells were brought on by added stress and family problems.  Plaintiff testified that he and his "wife" did not have a social life, and did not go to sporting or entertainment events.  He testified that both his parents smoked crack and all his aunts and uncles on his father's side were drug addicts. He no longer had sleeping problems now that he was on medication.  Tr. at 49-52, 56.

The VE questioned Plaintiff about a job he held from March 2002 to January 2003 as "order taker" or "order filler."  The VE then testified that this was Plaintiff's only past relevant job, which was classified as medium, unskilled work.  The ALJ asked the VE whether an individual of Plaintiff's age and education, who could perform light work with the exceptions of repetitive lifting with his left arm, no work above shoulder level, no repetitive gripping, grabbing, or maneuvering with the right hand, and who was limited to simple, routine, repetitive work that was not very complex and "not very stressful," could perform Plaintiff's past work as an order filler.  The VE responded in the negative.  The VE testified, however, that there would be other work that the hypothetical person could perform eight hours a day, five days a week, such as messenger route clerk,

office helper, and gate guard, and that there were a significant number of each of these jobs in the national economy and in Missouri.

Plaintiff's attorney asked whether the same individual would be precluded from work if he was seriously limited in dealing with the public, dealing with work stress, functioning independently, maintaining attention and concentration, relating predictably in social situations, and demonstrating reliability. These were the limitations noted in Nurse Nolan/Dr. Hall's May 10, 2005 Medical Assessment of Ability to do Work-Related Activities (Mental). The VE replied that the combination of those factors would preclude work activity. Tr. at 56-63.

### ALJ's Decision of January 26, 2006

The ALJ found that Plaintiff's history of left shoulder bursitis/tendinitis was not a severe impairment, but that Plaintiff's history of right shoulder disorder with contraction deformity in his right hand, and major depression were severe impairments. However, these impairments, separately or in combination, did not meet the criteria for a presumed-disabling impairment listed in the Commissioner's regulations. The ALJ proceeded to determine Plaintiff's RFC, citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), as the standard for evaluating allegations of disability. The ALJ noted that Plaintiff's work history did not bolster Plaintiff's credibility. Furthermore, the ALJ noted that no physician of record had indicated that Plaintiff was disabled. The ALJ credited the December 14, 2004 physical RFC assessment by Dr. Ivins as consistent with

Plaintiff's ongoing ability to perform a wide range of work, and a limited range of medium work, exertionally.  Tr. at 17-18.

In considering Plaintiff's mental functioning, the ALJ stated that Dr. Stuve's December 21, 2004 opinion was inconsistent with mental disability, specifically, Dr. Stuve's opinion that with regular treatment compliance, Plaintiff's impairment was projected to be non-severe within 12 months.  The ALJ stated summarily that this opinion was consistent with the record.  The ALJ acknowledged that Dr. Hall's July 23, 2004 psychiatric evaluation showed that Plaintiff had recurrent major depressive disorder, with a GAF of 50, which was "consistent with a moderate level of mental dysfunction."  The ALJ also acknowledged that the assessment of Nurse Nolan/Dr. Hall dated May 10, 2005, showed that Plaintiff had "moderate mental dysfunction."  The ALJ, however, relied upon Dr. Hall's April 11, 2005 comments that, among other things, Plaintiff's mood was stable with medications, that he was sleeping well, that he was watching the children while his girlfriend worked, and that his energy level was okay.  The ALJ found especially significant that Plaintiff was watching his children during the day, an activity which, according to the ALJ, was inconsistent with disability.  The ALJ concluded that, although Dr. Hall again diagnosed major depressive disorder, recurrent, moderate on April 11, 2005, "objectively in April 2005 while [Plaintiff] was taking his medications his symptoms appeared to be fairly well-controlled overall based upon his own treating psychiatrist's assessment."  The ALJ added that Plaintiff did not allege, nor did the record show, that Plaintiff sustained any ongoing adverse side effects from his medications.

14

The ALJ determined that Plaintiff had the RFC to lift/carry a maximum of 20 pounds occasionally, and 10 pounds frequently. Plaintiff could sit, stand, or walk for six to eight hours, but could not work above the shoulder level, reach repetitively with his left arm, or repetitively use his right hand. The ALJ further determined that educationally and mentally, Plaintiff was limited to simple, repetitive tasks in a low-stress environment. The ALJ recognized that as Plaintiff had no past relevant work, the burden shifted to the Commissioner to prove that Plaintiff could perform other work existing in significant numbers in the economy. The ALJ relied upon the VE's testimony that an individual with Plaintiff's vocational factors and RFC could perform the jobs of messenger route clerk, office helper, and gate guard, and that thousands of such jobs existed. Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into

account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423 (d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in

16

four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the presumed-disabling impairments listed in the Commissioner's regulations.  If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any.  If the claimant has past relevant work and is able to perform it, he is not disabled.  If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Medical-Vocational Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment.  Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as a mental impairment, the ALJ must consider

testimony of a VE. In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a VE must be in response to a hypothetical question which "captures the concrete consequences of a claimant's deficiencies." Cox v. Astrue, ___ F.3d ___, 2007 WL 2127352, at *5 (8th Cir. July 26, 2007). Here the ALJ decided at step five that, based upon the VE's testimony, there were jobs in the economy that Plaintiff could perform.

**Assessment of Plaintiff's RFC**

Plaintiff argues that the ALJ's RFC assessment did not take into account all of Plaintiff's mental limitations, by only excluding low-stress jobs. Plaintiff argues that accordingly, the question posed to the VE based upon that RFC was not valid. Plaintiff argues that the ALJ incorrectly characterized a GAF of 50 as showing "moderate level of mental dysfunction," when in fact it shows a "serious" level of dysfunction. Plaintiff points out that when the VE was asked whether a person with the difficulties reflected in Nurse Nolan/Dr. Hall's May 10, 2005 assessment could work, the VE responded in the negative. Plaintiff argues that this assessment was consistent with the rest of the record, and that the only contradictory evidence was Dr. Stuve's December 21, 2004 opinion that with medication, Plaintiff's mental impairments were not projected to last 12 months. But, Plaintiff argues, the record shows that the mental impairment did last at least up to May 10, 2005, more than 12 months from the alleged disability onset date. In sum, Plaintiff argues that the VE's answer to the hypothetical question posed by Plaintiff's counsel establishes Plaintiff's entitlement to a period of disability.

18

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, the ALJ essentially discredited Nurse Nolan/Dr. Hall's May 10, 2005 assessment of Plaintiff's abilities to do work related activities. An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician

renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); see also Anderson v. Barnhart, 344 F.3d 809, 813 (8th Cir. 2003) ("Although the opinion of a treating physician is normally entitled to deference, an ALJ need not defer to such an opinion when it is not internally consistent or is not supported by acceptable clinical or diagnostic data.").

The ALJ apparently believed that the May 10, 2005 opinion was inconsistent with Nurse Nolan/Dr. Hall's progress notes of one month earlier, and apparently relied upon those earlier notes to conclude that, with medical compliance, Plaintiff's mental impairments did not preclude him from holding jobs that involved simple, repetitive tasks in a low-stress environment. The ALJ also relied upon Dr. Stuve's December 21, 2004 opinion, based upon Dr. Stuve's review of the record to that date, that with medical compliance, Plaintiff's mental impairments were projected to be non-severe within 12 months.

The Court believes that a close question is presented on this matter. It is true that the record establishes that since April 2004, when his allegedly disabling mental impairment began, Plaintiff did not stick to his prescribed medications, and that when he did, beginning January 2005, his condition improved to the point where Dr. Hall found on April 11, 2005, that Plaintiff's mood was stable, his energy level was okay, and his attitude more positive. However, nothing in Dr. Hall's April 11, 2005 progress notes actually contradict Dr. Hall's and Nurse Nolan's May 10, 2005 opinion of Plaintiff's ability to perform work-related functions. See Hutsell v. Massanari, 259 F.3d 707, 712

(8th Cir. 2001) (noting that progress report that a patient who suffered from mental illness was "doing well" has "no necessary relation" to the individual's ability to work).

The ALJ did not sufficiently explain why he discounted the opinion of Plaintiff's treating psychiatrist and psychiatric nurse/therapist. And Dr. Stuve's projection on December 21, 2004, that with medical compliance, Plaintiff's mental impairments would not be severe, seems too speculative to be considered substantial evidence to support the ALJ's rejection of the treating sources' May 10, 2005 opinion. Noteworthy is the fact that the VE testified that an individual with the limitations delineated in the May 10, 2005 opinion would not be able to work.

Under the circumstances, the Court believes that the decision of the Commissioner must be reversed, and that the case should be remanded for reconsideration. On remand, the ALJ may want to obtain the opinion of an examining medical consultant on Plaintiff's ability to perform work-related functions, and/or the testimony of a VE in response to a hypothetical question that encompasses all of Plaintiff's mental impairments, when he follows prescribed treatment.

## CONCLUSION

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for further consideration.

The parties are advised they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 10th day of August, 2007